IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

AUDREY D. HUDSON,            )
                             )
           Plaintiff,        )
                             )
v.                           ) CIVIL ACTION NO. 03-PWG-3127-S
                             )
MR. BURCH FORMALWEAR, INC.,  )
                             )
           Defendant.        )

MEMORANDUM OF OPINION

Plaintiff Audrey D. Hudson, an African American female born November 29, 1956, filed this action against defendant Mr. Burch Formalwear, Inc. (Mr. Burch Formalwear) alleging gender, race and age discrimination in violation of Title VII, 42 U.S.C. § 1981 and the Equal Pay Act. The parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c) and LR 73.2. This matter is before the court on defendant's motion for summary judgment (doc. #13).

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 56, *Federal Rules of Civil Procedure*. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986);

*Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted].  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

The following pertinent facts are undisputed, or, if disputed, viewed in the light most favorable to Hudson, the nonmoving party.  Hudson began working for Mr. Burch Formalwear in 1993 as a shirt presser at the downtown location making $6.00 per hour.  Her supervisor at the time was Mike Burch.[1]

Prior to her employment with Mr. Burch, Hudson had worked at Central Laundry running a laundry machine and pressing sheets, worked at Shoney's as a fry cook, worked at Berthons as a presser, worked at Watkins Cleaners as a shirt presser and linen presser, worked at US-175 as a presser and working at Cooks Cleaners as a shirt presser.  Hudson testified that during her seven year employment at Central Laundry she supervised six other people but that she did not have authority to hire or fire employees.

---

[1]   Mike Burch is no relation to Wayne Burch and Leslie Burch who own and run Mr. Burch Formalwear.

Hudson performed her duties as a shirt presser at Mr. Burch Formalwear for approximately one year.  Her next job was "spot and cleaning" on tuxedo shirts, a duty she performed until she left.  Eventually Hudson also performed the task of marking in, tagging clothing and serving customers at the front counter.  If the plant manager, Mike Burch, was not there, Hudson would also rearrange the schedule for front-counter employees if another employee quit or did not come in to work.  Usually under such circumstances Hudson would call another employee in or fill in herself.

Hudson performed all of her duties at the downtown location of Mr. Burch Formalwear until August of 1999 when Ray Nichols resigned his position as manager of the Greensprings location.  At that time Hudson was asked if she would like to move to the Greensprings location until they found a manager.  Hudson admits she did not want to go and told Mike Burch that she did not "want to go and manage for $500.00, but I'll go because I need my job."  (Hudson depo., 126).  Hudson eventually agreed to go work at the Greensprings location.

On or about August 14, 1999 Hudson's salary was raised to $600.00 per week.  She worked in the Greensprings location until November 1, 1999 when Bob Gill, a white male, was hired as the plant manager of the Greensprings location at rate of pay of $580.00 per week.  Hudson asked Leslie Burch if she could stay on at the Greensprings store as manager, but he told her that they had already hired a manager.  At that point Hudson was brought back to the downtown location.

Following her return to the downtown location, Donna Lancaster, the officer manager and human resource person for Mr. Burch Formalwear, received complaints concerning the Greensprings location while Ms. Hudson was acting manager.  Lancaster received complaints about Hudson's harshness, hollering and unequal division of work.  After returning to the downtown location,

3

Hudson performed the duties she had previously.  She was promoted to the position of production supervisor.  On July 31, 2001 her salary was raised to $650 per week.

In December 2001 the dry cleaning plant at Greensprings closed and became a "dry store," which meant that there was no longer a cleaning plant on site.  Customers merely dropped off and picked up clothing.  At that time Mr. Burch opened a new location in Vestavia with a dry cleaning plant. Bob Gill was transferred to the Vestavia location.  The other Greensprings plant employees were also sent to Vestavia as well as the equipment.

On or about January 2002, Gill left the company and Gary "Rusty" Downs, a white male, was hired as the plant manager at the Vestavia location.  Downs was hired at a starting salary of $1,000.00 per week.  Downs had a B.S. degree in management and economics, had been a plant manager for two years at a dry cleaners, was a manager at a restaurant and responsible for over sixty employees for nine years and was an executive assistant for the State of Louisiana Department of Corrections where he managed over 15,000 inmates in work release programs.  During the interview process Downs exhibited tremendous communication skills and provided a plan for running the Vestavia location.

When Downs was hired as plant manager of the Vestavia location Hudson was not considered for the position because Lancaster believed, based on a prior conversation with Hudson, that Hudson wanted to remain at the downtown location.  Hudson, however, testified that she asked Leslie Burch for the Vestavia location before it opened and repeated in her testimony that she asked for the Vestavia store; however, she did not identify who she asked.  In addition, Lancaster had received complaints about Hudson and felt that the dissension among the employees, shouting and unfair job assignments were not indicators of a good plant manager.

4

On or about February 25, 2003 Mike Burch, the plant manager of the downtown location, resigned.  (Lancaster depo., 38).  Hudson's salary was raised to $700.00 per week at that time since Leslie Burch would take over the duties of plant manager and Hudson would oversee production.  On February 27, 2003 Mike Agee, a white male, was hired by Mr. Burch Formalwear to take over the paperwork and oversee the front counter aspect of the managing.  Hudson was to continue to perform the supervision of the production. Agee was hired into that position because of his seventeen years of experience in customer service, his previous managerial experience with a dry cleaner, his previous supervisory experience including hiring, staffing, evaluating staff, monitoring revenues and expenses and maintaining accurate records and reports.  Furthermore, Mr. Agee had been a general manager for eleven years at a previous place of employment and displayed good communication skills in his interview.  According to Hudson, Agee did not, however, know how to make or tag items or how to run the dry cleaning machine.

At the time of his hire, Agee's salary was $770.00 per week.  Hudson's salary was raised to $770.00 per week.  Hudson was also to continue receiving her yearly bonuses to which Agee was not entitled.

Hudson was told that she and Agee were equals and that they would both report to Leslie Burch.  Hudson would not cooperate with Agee.  She would not speak to him and production of the downtown location suffered.  The downtown location was in a state of disarray.  Downs was brought downtown to help get the plant back in order.

On the morning of March 11 or 12, 2003 Hudson was unable to enter the building.  Hudson was to report for work between 5:30 and 6:00 a.m. but she arrived a little after 5:00 a.m.  She had a store key but did not know the new store security code because she did not hear it when it was told

to her the previous day.  When she called Leslie Burch to get the new code he said he and Downs

would not be long.  According to Fox Alarm Company records the store was opened on March 11,

2003 at 5:43 a.m. and on March 12, 2003 at 5:44 a.m.  Hudson waited in her car for someone to

come open the store.

On March 11 or 12, 2003, the same morning that she had to wait on someone to unlock the

building, Hudson submitted a letter of resignation[2] stating:

> This is my Letter of Resingnation [sic].  I resign my job at Mr. Burch
> Cleaners on March 11, 2003.  I find the condition, overworked,
> understaffed.  We have been understaffed since December.  I also find
> it hard to continue working for an employer who does not value you
> as much as new mangers.  New managers who do not have the same
> skills that I have.
>
> Audrey Hudson
> 03-12-03

(Defendant's Exhibit 8).

I.      Failure to promote claims

A.      Promotion of Bob Gill on November 1, 1999 as Greensprings Plant Manager

Mr. Burch Formalwear argues that Hudson's § 1981 promotion claim relating to Gill's

November 1, 1999 promotion is barred by the statute of limitations.  Hudson argues that the statute

of limitation under § 1981 is four years.  In *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004)

the United States Supreme Court held that certain § 1981 claims would be subject to the  four year

limitations period in 28 U.S.C. § 1658, the federal "catch-all" limitations period,  rather than a two

year limitation period under state law.  Specifically, any claim made possible by an enactment

---

[2]      The letter referred to both March 11 and 12, 2003 and Hudson testified that she was not sure of the date when
she was writing the letter or at the time of her deposition.

subsequent to December 1, 1990, the enactment date of § 1658,  would be governed by the four year statute of limitation.

In *R.R. Donnelly*, the Court stated:

> We held in *Patterson v. McLean Credit Union*, 491 U.S. 164 ... (1989)  that the statutory right "to make and enforce contracts" did not protect against harassing conduct that occurred after the formation of the contract.  Under that holding, it is clear that petitioners' hostile work environment, wrongful discharge, and refusal to transfer claims do not state violations of the original version of § 1981.  In 1991, however, Congress responded to *Patterson* by adding a new subsection to § 1981 that  defines the term "make and enforce contracts" to include the "termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

541 U.S. at 372-73.

In *Patterson*, the court held that where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981." 491 U.S. at 185.

Because the Supreme Court recognized a § 1981 claim for failure to promote prior to December 1, 1990, the appropriate statute of limitations is two years.  Even if the statute of limitation was four years, this claim is still untimely because this action was not filed until November 23, 2003 – more than four years after Gill's promotion to the Greensprings' position.

Likewise, any disparate pay claim that Hudson claims survives under § 1981 is also untimely because the action was filed on November 23, 2003, more than four years after Gill allegedly was hired at a higher salary rate than Hudson.[3]

---

[3]    Because the court in *Patterson, supra*, did not recognize denial of wage increases as actionable under § 1981, the statute of limitation would be four years under the 1991 amount of § 1981.

7

Further, this claim is factually without merit.  Gill was hired on November 1, 1999 at the pay rate of $580 a week while Hudson had received a pay increase to $600 a week in August 1999 and also received bonuses in 1999 totaling $5,500.00.

B.      Denial of Promotion to Manager of the Vestavia Plant

1.      Promotion/Transfer of Gill to Vestavia

Hudson argues in her brief in response to the motion for summary judgment that she was twice passed over for the Vestavia Plant manager position.  She states that she was first passed over when Gill was promoted/transferred to the Vestavia Manager position.  Hudson never mentioned in deposition that she was complaining that she did not receive the position that Gill received at the Vestavia location.  (See Hudson depo., 212-14, 226-29, 266).  Further, the complaint did not place defendant on notice of this claim.  Hudson may not amend her complaint through argument in a brief opposing summary judgment.  *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

2.      Promotion/Hiring of Downs in January 2002 as Vestavia Plant Manager

Hudson alleges that she was overlooked for the Vestavia Plant Manager position when Downs was hired in January 2002.  Hudson stated in her responsive brief that she will voluntarily dismiss the age discrimination claim as it relates to the promotion of Downs as Downs is older than Hudson.  (See doc. #20, p.13, n.6).  Hudson was born November 29, 1956 while Downs was born October 16, 1955.  In the reply brief, Mr. Burch Formalwear argues that any remaining Title VII claims pertaining to the Downs' promotion and pay are due to be dismissed as untimely because Downs was hired/promoted in January 2002 and the EEO charge was not filed until March 12, 2003.  In defendant's brief defendant addresses the merits of Hudson's Title VII and § 1981 claims against

8

Downs.[4/] Even if the Title VII claims are untimely, the § 1981 claims are not.  The same analytical framework applies to both Title VII and § 1981.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), *reh'g en banc denied,* 172 F.3d 884 (11th Cir. 1999).

*McDonnell Douglas* Framework

Because Hudson attempts to prove her case with circumstantial evidence, the burdenshifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) is applicable.  Under this framework, Hudson has the initial burden of establishing a *prima facie* case of discrimination.  *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997), *cert. denied,* 522 U.S. 1045 (1998). If she proves a *prima facie* case of discrimination, the burden shifts to Mr. Burch Formalwear to rebut the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory reason for its action; however, "the defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254.  Defendant's burden is "exceedingly light" *Meeks v. Computer Associates, Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994).  If the defendant carries this burden, the presumption of discrimination created by the *prima facie* case "drops from the case" and "the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255, n. 10.  The burden then shifts to the plaintiff to present sufficient evidence, including evidence produced in support of the *prima facie* case "sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment

---

[4/]     The court notes that Title VII applies to both race and gender discrimination claims while § 1981 applies to race discrimination claims only.  In defendant's reply brief, defendant argues for the first time that the Title VII claims as they relate to Downs should be dismissed due to Hudson's failure to file her EEOC charge within 180 days of the hiring of Downs as required by 42 U.S.C. § 2000e-5(e)(1).  Hudson concedes that the claim involving the hiring of Downs is limited to a race discrimination claim under § 1981.

decision," but were merely pretext for intentional discrimination.  *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, *McDonnell Douglas*, 411 U.S. at 804).  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."  *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (emphasis added), citing *Combs v. Plantation Patterns*, 106 F.3d 1519 at 1529 (11th Cir. 1997).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. "  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000).

To establish a *prima facie* case based on failure to promote, Hudson must show that she (1) was a member of the protected class, (2) was qualified for the promotion Downs received, (3) was rejected for that promotion, and (4) Downs was equally or less qualified than Hudson.  *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001); *Johnson v. Firestone Tire & Rubber Co., Inc.*, 977 F.2d 527, 533 (11th Cir. 1992) (explaining a plaintiff is not required to show as part of *prima facie* case that she actually applied for a particular position when the employer uses an informal promotion system), *cert. denied,* 508 U.S. 961 (1993).

Mr. Burch Formalwear argues that Hudson has failed to establish the second and fourth elements of her *prima facie* case.  Hudson argues that she was qualified for the manager position since she regularly performed the managerial duties and even held the position of manager at the Greensprings store.  Hudson does not address, however, whether Downs was equally or less qualified than Hudson in the *prima facie* context.  She has thus failed to establish her *prima facie* case based on failure to promote.

10

Mr. Burch Formalwear also articulated a legitimate non-discriminatory reason for its decision not to promote Hudson and to hire Downs.  Specifically, defendant argues that Downs had superior qualifications for the position for various reasons.  Downs had a B.S. degree in management and economics, had been a plant manager for two years at a dry cleaners, was a manager at a restaurant and responsible for over sixty employees for nine years and was an executive assistant for the State of Louisiana Department of Corrections where he managed over 15,000 inmates in work release programs.  In the brief in response to the motion for summary judgment Hudson does not dispute either that Downs was more qualified or that defendant thought Downs was more qualified  (Doc. #20, p.15).  In order to prove pretext when the issue is relative qualifications, the plaintiff must not only show that she was better qualified but that the disparities in qualifications are so apparent as to virtually "jump off the page and slap you in the face."  *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000), [quoting *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 280 (5th Cir. 1999)], *cert. denied,* 532 U.S. 958 (2001).  Based on the record before the court there is no showing of such disparities.

Rather, Hudson focuses on defendant's "other evidence" which Mr. Burch Formalwear argues entitled it to summary judgment.  Mr. Burch Formalwear argues following Hudson's return from Greensprings to the downtown location, Hudson and Lancaster had a conversation.  At the end of the conversation Lancaster believed Hudson was not interested in working at any location other than the downtown location.  Hudson argues this is pretext.  Hudson argues that this was not the real reason that defendant did not promote her to the Vestavia position.  She points to Leslie Burch's deposition testimony that Hudson asked to be moved back downtown and was not considered for

or qualified for a managerial position because she never expressed an interest in a managerial position as well as her own testimony that she <u>did</u> express an interest to him in a managerial position.

Leslie Burch testified in deposition that he did not consider sending Hudson to Vestavia because she had told Lancaster and Mike Burch that she wanted to be downtown.  (L.Burch depo. at 27-28).

Hudson testified:

Q:    So they both told you that they had fired ray [sic] Nichols?

A:    Yes.

Q:    And then what did they say?

A:    Nothing.  Nothing else was said that day and, you know, they just closed up like regular.  And I guess in the meantime they was trying to find someone for over there and it never dawned on me to go over there, you know, because I liked where I was.

Q:    So you didn't request to go to the Greensprings location?

A:    No.  No, I didn't.

Q:    You preferred working at the downtown location?

A:    Yes.

Q:    Tell me what happened after that day because eventually you made it to Greensprings.

A:    In between that week Mike Burch wanted to know if – the people upstairs wanted to know if I would and I guess – I assume that would be Leslie Burch and Wayne Burch.  I'm not sure if Donna – but I'm sure she knew about it, if I wanted to go to Greensprings to manage until they fine [sic] a manager.

Q:    Okay.

A:    And I'm like I don't want to go and manage for $500.00, but I'll go because I need my job.  So I went over and while I was over there I did get a raise.

. . . .

Hudson testified:

>        ... I asked to work for – to keep – to stay at Mr. Burch on Greensprings.

Q:      You asked to –

A:      Yes.  I asked Leslie Burch.

Q:      Okay.

A:      He said that they had hired a manager.

Q:      You asked Leslie and he told you they had hired a manager?

A:      Yes.

. . . .

Q:      Did you think it [that she was not hired to fill the Greensprings' position] had
        anything to do with the fact that prior to going there you didn't want to go?

A:      No, because I never told them that I didn't want to go.  I never told anybody I just
        didn't want to go.  I didn't even make a commitment to Mr. Burch that I didn't want
        to go, but I didn't want to go.

Q:      So you're saying that you didn't testify earlier in this deposition that you told Mike
        Burch that you didn't want to go to Greensprings?

A:      I'm not sure, but I know I didn't say anything to them that I didn't want to go.

Q:      Who is them?

A:      The owners.

Q:      Well, Mike Burch worked for Mr. Burch Formalwear; didn't he?

A:      Yes.  But he wasn't an owner.

Q:      Right.  But don't you think he would have had discussions with the –

A:      Probably so.

13

Q:      – managers and the owners?

A:      Probably.

Q:      And do you think he may have passed that along to Leslie Burch and said well, Audrey's going to go ahead and take the job but she told me she really doesn't want to do it?

A:      I'm not sure.  He may have and he may not have.

Q:      But you have no independent knowledge of whether or not he did?

A:      I don't know.  No, sir, I don't.

. . . .

Q:      Tell me all of the other ways that the terms and conditions of employment have been different for you than other males that are performing the same job duties as you.

A:      Because that is not the first time I have asked to run a plant.  I asked for the Vestavia store before they got it open and Leslie Burch told me they were looking for special people, so.

. . . .

Q:      What else?

A:      I mean, I asked for that Vestavia store also.  And every time I would ask for that store it's always a male, a while [sic] male, that they put in that place.

(Hudson depo., 125-26, 188-92, 195).

It is unnecessary for the court to determine whether defendant's alleged belief that Hudson wanted to stay at the downtown location was not the real reason for defendant's failure to promote her because she has not proffered evidence on each of defendant's explanations.  *Chapman v. AI Transport*, *supra*.

As previously mentioned, defendant's explanation that Downs's qualifications were superior was not addressed by Hudson.  There is no genuine issue of material fact regarding whether this

articulated reason is pretextual and Mr. Burch Formalwear is entitled to summary judgment on the claim concerning the placement of Downs in the Vestavia location.

3.      Promotion/ Hiring of Mike Agee in February 2003 at Downtown Location

In her deposition, Hudson testified that she thought Mike Agee was hired as the permanent plant manager of the downtown location.  (Hudson depo., 213,229).  However, she further testified that she was told by Leslie Burch that she and Agee were both supervisors.  (Hudson depo., 215, 218).  In the brief in response to the motion for summary judgment Hudson argues:

> The plaintiff claims that Mike Agee was hired in to work at the downtown location after Mike Burch's resignation.  Agee was given more of the lighter duty jobs such as paperwork and other office type responsibilities, while the plaintiff continued to perform most of the manual labor type work.  The plaintiff had substantial experience performing all of the managerial duties at the store and should have been placed as the Plant Manager of the downtown location instead of bringing Mike Agee in at a higher rate of pay.

(Doc. #20, p.16).

Hudson has failed to establish that Agee was promoted into a position for which Hudson was more qualified and for which she was rejected.  Hudson's argument position regarding Agee was based on her belief that he was hired/promoted into the plant manager position for the downtown location.  This belief, however, is incorrect.  Agee was hired as a supervisor when Mike Burch left and Leslie Burch took Mike Burch's place as manager.  (Leslie Burch depo., 18-19).  Leslie Burch also testified:

Q:      What were [Agee's] duties as supervisor when he was first brought in?

A:      He was working downtown with Ms. Hudson.  Ms. Hudson was doing the production in the back and supervised that, Agee would supervise more towards the front.

Q:      Were they considered to be equal?

A:      Yes.

(Leslie Burch depo., 15).

Q:      When Mike Agee was brought in, were any of Audrey's duties taken away from her?

A:      No.

Q:      Did you consider the job that Mike Agee was doing to be an easier job than Audrey was doing in the back?

A:      No.

Q:      Was the job Audrey was doing a physically more demanding job?

A:      No.

Q:      What was Mike Agee doing exactly, what were his duties that he was performing when he was first brought in?

A:      He was a supervisor.

Q:      What did he do on a daily basis?

A:      He would supervise the store towards the front, Audrey toward the back.

Q:      Did he supervise people?

A:      I did that.

Q:      As a supervisor, what – while he was supervising, what did that mean he was doing.

A:      Get the clothes on the conveyor, make sure the customers are taken care of, make sure clothes are getting tagged in, marked in.

(Leslie Burch depo., pp.25-26).

Burch described Hudson's duties:

Q:      When Audrey was moved back to the downtown location, what were her job duties there?

16

A:      She's production supervisor.

Q:      What does a production supervisor do?

A:      Clean the clothes.

Q:      Do they supervise anyone?

A:      No.

Q:      Why are they called a supervisor?

A:      They were over production.

Q:      Tell me what you mean by that, they were over production.  What do they do?

A:      They clean the clothes.

Q:      Are there other people that work in the back cleaning the clothes at the plant besides a production supervisor?

A:      Me.

Q:      Okay.  Are there any other employees involved in the cleaning or the dry cleaning of clothes at the plant other than you and the production supervisor?

A:      At which time are you speaking of?

Q:      When Audrey worked there.

A:      Basically, it was pretty much Audrey cleaned the clothes.

(Leslie Burch depo., 14-15).

The term supervisor as used by Mr. Burch Formalwear appears to be a misnomer.  The title supervisor implies that a person is overseeing the work performed by another; however, it is clear from the testimony of Leslie Burch that neither Agee nor Hudson was overseeing work done by others.  In any event, it is clear that Agee was not promoted to plant manager nor to a position superior to her own.  Hudson has failed to establish a *prima facie* case of failure to promote.

17

Pay Claims

    1.    Bob Gill

As previously stated, any disparate pay claim under § 1981 with respect to Bob Gill is barred by the four year statute of limitation as he was hired on November 1, 1999 and this case was not filed until November 23, 2003. Moreover, it is without merit as Gill was hired at the rate of $580.00 per week and Hudson was making $600.00 per week at the time of Gill's hiring.

    2.    Rusty Downs

In *Alexander v. Chattahoochee Valley Comm. College*, 325 F. Supp. 2d 1274 (M.D. Ala. 2004), the Honorable Myron H. Thompson provided an overview of the Equal Pay Act and Title VII in the context of discriminatory pay claims:

> ... The Equal Pay Act applies to pay discrimination on only the basis of sex, while Title VII ... also appl[ies] to discrimination on the basis of race. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992). The laws also differ in several other ways. The Equal Pay Act requires a plaintiff to meet a "fairly strict" burden of proving she did "substantially similar" work for less pay. *Id*. If she can do so, the burden shifts to the defendant to prove an affirmative defense. By contrast, Title VII requires a plaintiff to show a more "relaxed standard of similarity" between the jobs, but the burden never shifts to the defendant. *Id*.; *Glover v. Kindercare Learning Centers, Inc.*, 980 F. Supp. 437, 443 (M.D. Ala. 1997).
>
>          . . . .
>
> In order to establish a *prima facie* case under the Equal Pay Act, a plaintiff must show that her employer pays different wages to employees of different sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Equal Pay Act, 29 U.S.C.A. § 206(d)(1); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); *Arrington v. Cobb County*, 139 F.3d 865, 876 (11th Cir. 1998). To establish a *prima facie* case, a plaintiff must demonstrate "that the jobs at issue

are substantially similar; a plaintiff does not have to show that the skills or qualifications of the actual male and female employees holding the positions are also substantially equivalent." *Arrington*, 139 F.3d at 876.  Further, the *prima facie* case focuses "on the primary duties of each job, not duties that are incidental or insubstantial." *Miranda*, 975 F.2d at 1533.  Although job titles and descriptions may be considered, the "controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content." *Arrington*, 139 F.3d at 876.

325 F. Supp. 2d at 1293.

In deposition, Hudson described her duties at the Greensprings location:

A.    I would come in the morning time and set the registers, turn the boiler on, turn the equipment on and unlock the door for the people that worked there.  Then when the day started the front counter person would come in if she needed help I helped her, but if not I went back to spot and clean.

Q.    Did you set the schedule for every employee that was working at the Greensprings location at that time?

A.    Yes, sir.

Q.    Did you do that on your own?

A.    Yes, sir.

Q.    How many employees were working there other than yourself?

A.    I'm thinking maybe nine.

                                        ....

Q.    What else did you did?....

A.    We had a route and we just had to, you know, check off like we do every day, every week.  Check the checks off and check the amount of money.  We would run – the report we run is for weekly.

Q.    So you would run a weekly report –

A.     I'm thinking it was daily.

Q.     A daily report?

A.     Yes, we ran the report every day.

Q.     What did that report have in it?

A.     It will have what was marked in, what was cashed out, what checks were taken in, like that.

Q.     When you say you ran the report, was all of that information already in the computer and you just printed it out?

A.     Yes.  You printed it off.

Q.     Did you have to give that report to someone?

A.     Yes, I sent it downtown.

Q.     To whom, to Leslie Burch?

A.     Yes.

Q.     Now when you were the manager of the Greensprings location was your immediate supervisor Leslie Burch?

A.     Mike Burch.

....

Q.     How often did Mike Burch come to the Greensprings location while you were there as a manager?

A.     Sometimes once a day.  Sometimes.

....

Q.     And what was he there for?

A.     To check to see how things were going, if everybody came to work.  Sometimes he just called in, you know. ....

Q.     How long did you stay at the Greensprings location?

20

A.      I'm not sure.  Maybe six or nine months, something like that.  I'm not sure.

....

Q.      You have used the phraseology that you were a manager at the Greensprings location.

A.      Yes.

Q.      Prior to coming to the Greensprings location what would you have called your position at the downtown location?

A.      Assistant manager.  I did all of the manager's work.

Q.      Assistant manager.  And you say you did all of the manager's work, the manager being Mike Burch?

A.      I did all of the work that a manager does.

....

Q.      And you say that you performed all the duties of a manager.  What duties did you perform that a manager would perform?

A.      The opening, the closing, the payroll.  Everything that had to done there, I did it.

Q.      Now the payroll has to be okayed by Leslie Burch before it's done; right?

A.      Uh-huh.  (Affirmative.)  And he knew about it also.  He knew who was running – Leslie Burch knew who was running payroll.  And I would run the statements off because Leslie didn't know how to run the statements off.

Q.       When you say run the statements off, that consists of getting on the computer and printing something off that's already in there; right?

A.      Yes, it's already in there.

....

Q.      People come in and they punch in their code when they arrive and when they leave and there is a system set up in the computer –

A.      For their time.

21

Q.      – that puts all of that into some kind of a spreadsheet and you go into computer and print out that spreadsheet?

A.      Yes.

(Hudson depo, 128-135).

Hudson testified that she never asked if she had the authority to hire employees while manager at Greensprings but she thought she had the authority to hire and fire employees and she wrote up two employees while at Greensprings. (Hudson depo, 136-38).  While working at the downtown location, she testified that she issued writeups only after first discussing them with Mike Burch and that both she and Mike Burch would then sign the writeups.  (Hudson depo, 138-39).  Hudson testified that at the downtown location, she supervised employees in both the back and the front of the plant:

Q.      And who informed you it was your duty to supervise these?

A.      Leslie Burch and Mike Burch.

Q.      What did Leslie Burch tell you?

A.      Well, when I first started he said that Mike is not going to be able to be there all the time and  so I need you to keep things going just the way they're going and handle it.
                                        ....

Q.      So .. Leslie Burch told you that you're going to have to –

A.      He didn't say I was going to have to.  He said, Audrey, I need you to handle the front and the back for me on times when Mike Burch is not here.

Q.      And you took that to mean that you were the supervisor of all of these employees that worked at the store?

A.      Yes.  When no one else was there besides me.

Q.      Even when Mike Burch was there?

A.      When he was there I left it to him.

Q.      So you were a part-time supervisor when Mike Burch wasn't there.

A.      I don't know about the part-time.  I was there – supervisor as long as I was there it was just that I didn't have to handle it as much if the manager or district manager was there.  When Leslie was there it wall to him, you know, unless something happened.

(Hudson depo, 152-54).

Hudson testified that the terms and conditions of Downs' employment were different than hers because there was a spot cleaner at the Vestavia store and Downs "had time to be manager because he just – there was a spot cleaner." (Hudson depo, 193).  She further testified that Downs didn't open and close the store every day.  (Hudson depo., 194).  Hudson also testified that she opened the downtown location "maybe two or more" times a week but that Mike Burch was usually right behind her (Hudson depo, 110).  She also closed the store sometimes with Leslie Burch, sometimes with Mike Burch and between one and three times a week by herself.  (Hudson depo, 112).

Leslie Burch testified that he acted as the manager of the Greensprings location between the firing of Ray Nichols and the hiring of Bob Gill and that Hudson's duties at the Greensprings location were "[t]o clean the clothes, keep production going."  (Leslie Burch depo, 13).  He further testified that when Hudson moved back to the downtown location, she was a production supervisor and her job was to "clean the clothes."  He testified that a production supervisor does not supervise anyone but is called a supervisor because they are "over production" and by that, he meant, "they clean the clothes."  (Leslie Burch depo, 14-15).

Donna Lancaster also testified concerning the duties performed by Hudson:

Q.      When [Hudson] was at Green Springs, was she performing all the duties of a manager at that store?

A.      No.  She was overseeing the back, the production in the back. Leslie was picking up all of the check outs, and he's the one that would always bring to me the payroll.

23

He's the one that always went over the payroll making sure everybody's hours were okay.

....

Q.   Tell me what a store manager with Mr. Burch does with the dry cleaners.

A.   They come in in the mornings, get everything started, have the – take care of the money.  They do all of their scheduling. ... They get the production – see to it that the production is started.   They have to handle all employee write-ups.  And if it's more than after the first write-up, then they're brought to my office in addition to that. They handle the money, the bank outs, they do the paperwork for those bank outs for the EFS, the credit cards and all of that.  They have to deal with the people that come in for hazard waste removal.

....

Q.   Do you know if Ms. Hudson ever handled any of the bankouts or any of the paperwork at the Green Springs location when she was there?

A.   Not to my knowledge. Leslie handled that.

Q.   Do you know if she ever dealt with the payroll at the Green Springs location?

A.   I think the only thing she would have done would have been print out.  The employee's put in – on the computer our system works that you clock in and clock out on that computer and then at the end of the week you just print it.  I think she probably printed it out, but there was no input or anything that had to be done.

....

Q.    Who did the scheduling at the Green Springs location when [Hudson] worked over there?

A.    I think Leslie and Mike did.

(Lancaster depo, 19-24).

Q.   What job was Audrey Hudson doing at the time that Rusty Downs was chosen to take over the Vestavia location?

A.   Same one she had been doing, supervising the production in the back.

Q.     And as far as you know, what did that involve, the supervising the production in the back?

A.     Working with the plant manager to make sure that there was plenty of work ready for the pressers when they came in and just – she could do spotting on clothing.  Really just making sure everything ran smoothly, there weren't any glitches in the production.

Q.     Was spotting something a manager typically did?

A.     I think Mike could do it, but no, it's not something they usually do.  He could do it.

(Lancaster depo, 32-33).

Although Hudson argues that she performed the duties of a manager, she never performed the entire range of managerial duties at any location. While at Greensprings, she printed out the bank reports and payroll but sent them to Leslie Burch for review.  In addition, she was never told, but merely assumed, that she had authority to hire and fire employees. She did not hire or fire any employees while at the Greensprings location.  After her brief (2 ½ months) stint at the Greensprings location, she returned to the downtown location where she testified that she supervised other employees only in the absence of Mike Burch and Leslie Burch.  Consistently, she included in her duties "spotting and cleaning."

It's clear from the testimony of Leslie Burch and Lancaster that the paperwork and supervision of employees are among the more important functions of a plant manager and were not functions performed by Hudson.  While Hudson complains that Downs did not "always" open and close and that he had a "spotter" (i.e. he did not clean), this did not make him less than a plant manager.  Conversely, the fact that Hudson printed reports and payroll (but was not responsible for reviewing them), did not transform her from a "production supervisor," or spotter/cleaner, into a plant manager.  Hudson apparently did perform some tasks that are usually performed by managers

25

(such as opening and closing the store) on occasion; however, these tasks do not appear to be uniquely managerial in nature. Rather many of the functions Hudson performed were among the rote tasks of the plant manager as opposed to the tasks which required more concentration. As a plant manager, Downs had different responsibilities and priorities than Hudson in her assigned position. Furthermore, as plant manager, Downs was ultimately responsible for all that happened within his store.

The jobs held by Downs and Hudson (whether the position held by Hudson at the Greensprings location or the position held by her at the downtown location) were not "substantially similar" within the meaning of the Equal Pay Act nor were they sufficiently similar within the meaning of Title VII to establish a *prima facie* case of pay discrimination based on race or gender.

3. Mike Agee

After Mike Burch resigned but prior to Mike Agee being hired, Hudson's salary had been increased to $700.00 per week. When Agee was hired at the rate of $770.00 per week, Hudson was told that she was getting an additional raise but she was not sure what her salary was being raised to. (Hudson depo., 204-205).

Lancaster testified that Hudson's salary was increased to $770.00 to match Agee's salary and Hudson was told of this raise. (Lancaster depo., pp. 43-44,58). Lancaster testified that they did not discuss paying Hudson more than $770.00 because Hudson was receiving bonuses and Agee would not be eligible to earn bonuses. (Lancaster depo., 44-45). Agee and Hudson both had the same title, "supervisor" but as previously discussed their duties were different. Despite the difference in responsibilities they received the same pay. Because of the differences in duties, Hudson cannot

establish that Agee's and her jobs required "equal skill, effort and responsibility." More importantly, she cannot show they received different wages.

Hudson attempts to create a question of fact about whether she received the pay raise to $770.00–thus increasing her salary to match Agee's:

> The plaintiff's salary at the time Mike Agee was hired was $700 per week, having just been raised upon the resignation of Mike Burch. Mike Agee was brought in at $770 per week. There is abundant testimony that Agee and Hudson were considered to be equals, even though Hudson knew the downtown operation backwards and forwards, and had extensive experience in the dry cleaning business. The defendant insists that the plaintiff's salary was also raised at the same time Agee was hired. However, the plaintiff did not receive this salary until she had already quit Mr. Burch and had filed her EEOC Charge. (See Plaintiff's Exhibit 6 - EEOC Charge; Plaintiff's Exhibit 7 - Pay Stub dated 3/11/03). Therefore, there is a question of fact about whether or not the plaintiff actually received a salary of $770 before she quit, or if the $770 amount was merely an attempt to avoid liability for the discriminatory pay disparity. As such, summary judgment is inappropriate on this claim.

(Doc. #20, p.18).

Hudson admits that when Agee was hired she was told that she was getting a raise over and above the raise she had received when Mike Burch resigned. Agee received his first paycheck on March 11, 2003 at a rate of $770 per week. Hudson's check on March 11, 2003 showed Hudson's salary to be $700 per week. Lancaster told Hudson that there had been a mistake with payroll. A check for the difference was issued on March 11, 2003 with a check date of March 12, 2003 and that check was delivered to the downtown location at approximately 8:00 a.m. on March 12, 2003. While Hudson implies that the decision to raise her salary was not made until after she had quit and filed her EEO charge, this is contradicted by: (1) the affidavits of Lancaster and Harvey which explain the error that resulted in the raise not being reflected in the correct paycheck, (2) plaintiff's

deposition testimony that she was told upon Agee's hiring that she was receiving an additional raise, (3) the EEOC charge which was filed March 12, 2003 and which was received by Mr. Burch Formalwear on March 14, 2003.

There is no genuine issue about whether the salaries of Hudson and Agee were the same.

D.     Constructive Discharge

"A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003).  As support for this claim, Hudson argues

> The evidence in this case shows that plaintiff was a good employee for the defendant for almost ten years.  She worked and worked in a fairly tough environment and hoped that eventually she would be rewarded.  She was not.  Time after time lesser qualified white males were placed into Plant Manager positions while she was overlooked and kept in the back.  Eventually, she was forced to wait out in the early morning on the streets of Birmingham because she could not get into the building.  Then in a final act of discrimination, the defendant brought in an individual to be the plaintiff's "equal" paid him more money and gave him easier job duties.  The plaintiff could take it no longer and she turned in her resignation.  She took as much from this company as any reasonable person could have taken.  She was left with no other alternative but to resign.

Hudson complained that she did not receive three plant manager promotions.  She did not indicate any interest in receiving the 1999 Greensprings promotion until <u>after</u> a new manger had been hired. There was <u>not</u> a new manager hired for the downtown location following Mike Burch's resignation on February 25, 2003; further, Agee and Hudson's salaries were the same except that Hudson was also eligible to receive bonuses.  The only promotion she did not receive that she said she expressed an interest in was the 2002 Vestavia plant manager position that Downs received.  As previously

28

discussed, Hudson failed to establish a *prima facie* case of discrimination because she did not show that Downs was equally or less qualified than her.  She also did not establish pretext by showing that she was better qualified than Downs or that defendant did not believe Downs to be better qualified.

Finally, Hudson was told the new security code to the building the day before was unable to enter the building.  She testified that she realized she did not hear it and did not ask that it be repeated.  The next day, she arrived a little after 5:00 a.m. even though she was not required to report to work until 5:30 - 6:00 a.m.  Hudson called Leslie Burch for the code and she was told that he and Downs would be there shortly.  The building was opened at 5:43 or 5:44 a.m.  She waited in her car in the parking lot no more than forty-four minutes for someone to arrive and let her in.  It was Hudson's own failure to ask that the code be repeated combined with her arrival thirty minutes prior to her scheduled arrival time that resulted in her having to wait at all or having to wait more than fifteen minutes for someone to arrive and let her in.  In light of the above, the court concludes that the working conditions were not so intolerable that a reasonable person in Hudson's position would have been compelled to resign.

Based on the foregoing, defendant's motion for summary judgment (doc. #13) is due to be GRANTED.  A separate Final Judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 30th day of September, 2005.

_____

PAUL W. GREENE
CHIEF MAGISTRATE JUDGE

29